1. Though the evidence of the trial of a processioning proceeding under Chapter 85-16 of the Code is not sufficient to authorize the establishment of the line between coterminous owners of adjacent land lots as located by the processioners, yet it is error to dismiss the entire proceeding on the ground that it is the province of the processioners to survey and mark anew established lines as they actually exist, and because they are without authority to run a new line, where the evidence as a whole authorizes the jury to establish such dividing line other than as located by the processioners.
2. Refusal to direct a verdict is not error in any case. Roper Wholesale Grocery Co. v. Faver, 8 Ga. App. 178 (1) (68 S.E. 883); Kelly v. Strouse, 116 Ga. 872 (43 S.E. 280); Western Atlantic Railroad v. Michael, 178 Ga. 1
(172 S.E. 66); Coastal News Co. v. Jacksonville Paper Co., 66 Ga. App. 228 (17 S.E.2d 760).
 DECIDED OCTOBER 29, 1947.
On May 6, 1947, Marvin E. Rogers filed an application with the processioners of land of the 1013th District G. M., Murray County, alleging that he is the owner of lots of land numbers 231 and 232 in the 26th District and 2nd Section of said county, said two lots containing 160 acres each, more or less, and lying *Page 17 
and being in the militia district to which reference is herein made, and applying for the survey and marking anew of the north and south line on the west side of said lots, he contending in his application that this boundary line of his property is the original line. In his application he names as owners of adjoining lands several persons including Mrs. Cornelia Beavers, the protestant. On May 7, the processioners of land to whom this application was made, notified all adjoining landowners including protestant that "Marvin E. Rogers, the owner of lots of land numbers 231 and 232 in the 26th District G. M., said county, having applied to us to have the original lines of west side of said two lots of land surveyed and marked anew, are hereby notified that we have appointed the 20th of May, 1947 at 8 a. m., as the time when we or a majority of us, with the county surveyor, Mr. Jim Springfield, will trace and mark said lines." At the appointed time the three processioners and the county surveyor proceeded to locate, survey and mark anew, a north and south line insisted by them and the applicant to be the original west line of said two lots of land, lot 231 lying immediately south of lot 232. On June 7, the processioners filed their return with the ordinary, in which they reported that pursuant to the application of Marvin E. Rogers and after notice referred to herein they proceeded to trace and mark anew the original north and south lines on the west side of lots 231 and 232. With this return they filed a plat showing north and south tier of lots beginning with lot 232 at the north end of said plat and southward in order there appear lot numbers 231, 230, 229 and 228; also on said plat is another tier of lots adjacent to and west of the tier of lots first referred to, beginning at the north of lot 237 and southward in order there appear 238, 239, 240 and 241; hence lots 232 and 231 are adjacent to and east of lots 237 and 238. On July 2, Cornelia Beavers, the protestant, filed with the ordinary her protest in writing. On the same day this paper was turned over to the clerk of the superior court and filed in his office. In her protest she contends that the line as run by the processioners along her property, she contending that she owns lots 237 and 238 which are located as before pointed out immediately west of lots 232 and 231, is not the true line dividing her property and that of the applicant; but on the contrary, she contends that the *Page 18 
true line is 300 yards east of the line as run by the processioners, and begins on the south boundary of lots 238 and 231 at a locust post corner, running thence north to a rock cliff corner, and thence continuing north to a chestnut-oak tree on the north boundary of lots 237 and 232. The papers were returned by the ordinary to the clerk of the superior court and by him entered upon the issue docket for the August term of the superior court of said county. The cause came on for hearing before a jury in the superior court on August 14, at which time the protestant filed an amendment contending further "that the processioners and surveyor ignored their contentions and claims as to the location of the true line, and without considering the question of occupancy and possession of said premises and without hearing any evidence relative to these claims, established a line beginning at a corner known as the Government corner, and running due south along what the processioners and the surveyor found to be the original line between the lots of land belonging to these parties." Counsel for the applicant introduced the entire processioning proceedings, including the application, notice to the protestant, certificate of the surveyor, the plat and the return of the processioners together with all entries thereon, and rested. Thereupon the protestant put up a number of witnesses, the first of whom was the protestant herself, Mrs. Cornelia Beavers, who testified in substance: That she lives on lot of land number 238, she has another lot up there number 237, north of lot number 238; she has been living there since 1911; she married an heir to this place, Lucius Beavers; she bought both heirs out, first her brother-in-law, John Beavers about 24 years ago, and later she bought her husband out; that she has always known and recognized the dividing line between lots 232 and 231 on the east and 237 and 238 on the west, to be marked by a Spanish oak at the southeast corner of 238 (which point also is the southwest corner of lot 231 and constitutes the southern end of the line in question according to protestant's contention), the middle corner (southeast corner of 237 and southwest corner of 232 according to protestant's contentions) is marked by a rock cliff, and the next corner (northeast corner of 237 and northwest corner of 232 which is the north end of the line in question as contended by protestant) is marked by a *Page 19 
chestnut tree; that John Gregory, now deceased, was a former owner of lots 232 and 231 now owned by the applicant and that he recognized and acquiesced in the line as contended by protestant; that on one occasion when he was selling timber off his property, he pointed out the rock cliff as one of the corners in question; also that Ash Bates once owned the upper lot of Mr. Rogers' (lot 232), and that he recognized the line as contended by protestant. That her husband and brother-in-law who were raised on the property knew the line as contended by her. She also testified that the timber had been sold from her lots three different times, and each time was cut up to the line as contended by her; the first time it was sold by Mother Beavers to Chip Owens, in 1909; later in 1920 to 1924, to W. B. Farrar by John Beavers; then she sold to Evans of the Crandell Lumber Company who are now cutting the timber. She also testified that this line had previously been run by other persons not parties to this proceeding and found to be as contended by her. Also that the applicant came to her in the year 1935 and agreed to run the line with her and thus establish it; that he came to her house and she, together with Lucius Beavers and Junior Beavers, assisted him in running the line from the rock cliff north to the tree marking the north corner; that the applicant used the compass and Junior Beavers went ahead trimming in front and that she did the marking; that when they got to the tree at the north corner the applicant took the axe from Junior Beavers and made the corner himself, saying, "Now Nelia we have got us a line and a corner;" that he stated he could not run the other line (from the rock cliff corner south) the next day as he had some knocking about to do; that later he returned and stated that he had run out the south end of the line making it pretty good and that by going down cross the branch twice he found the corner; that in a few days he came back to her house and asked to be shown his corner and that Lucius Beavers showed him the corner south of the rock cliff corner marked by the Spanish oak tree. She testified that Mr. Rogers agreed with her on this line but that about 18 months later he returned and stating his dissatisfaction with this line wanted to run it again; that after some negotiations it was agreed to set up a new corner to be marked by a locust post as *Page 20 
to the line separating lots 238 of protestant and 231 of applicant; that it was then agreed that this line control as to the south end of the line and that the line from the rock cliff would control as to the north end; that immediately pursuant to this agreement the timber cutters proceeded to cut in accordance therewith. She testified that the line run by the processioners and surveyor, purporting to separate her north lot (237) and applicant's north lot (232), is 300 yards west of this agreed line and that the line as run by them, purporting to separate her south lot (238) and applicant's south lot (231), is 200 yards west of this agreed line. She testified that she knows where the processioners and the surveyor ran the line and that they ran up to two of her orchards, one on lot 237 and the other on lot 238, moved eastward to keep from going through the orchard and then back westward continuing through her property; that they ran through clearing and lands that she and her predecessors in title have had in their possession for more than 20 yards; that the acts of possession that she and her predecessors in title have exercised over the property have consisted of cutting the timber and removing same on three different occasions from the year 1909 to the present time, putting out and maintaining orchards, a garden, cultivating other portions of the land and taking tan bark from it; that the processioners and the surveyor ran the line on what they considered the original line without regard to the line as it actually exists between the lands herein described as belonging to the applicant and the protestant by virtue of agreement between coterminous landowners, acquiescence by them to the line as contended by protestant, and adverse possession to said line by protestant and her predecessors in title both for more than 7 years under color of title and actually for more than 20 years.
Rufus Beavers, a witness for protestant, testified as to his familiarity with the line in question and landmarks consisting of those contended by her, and that he had so known the land and landmarks for 40 years. Also Junior Beavers, who testified as to his assisting the protestant and applicant in running the line. Also Bradley Tankersley and William Palmer, who told about the second running of the line by the parties. Also Floyd Larmon, who testified that 25 years ago he had assisted protestant's *Page 21 
husband and brother-in-law in cutting tan bark and that they cut up to the line as contended by protestant; that he did not know whether the then owner on the east knew they were cutting or not. Also Will Gregory, son of J. P. Gregory, former owner of applicant's property, who testified that on the 3d Monday in February, 1913, 34 years ago, the line was run from the rock cliff north to the chestnut oak; also that his father and one Williams ran a survey from a locust post marking the southeast corner of lot 239, north to the rock cliff. The protestant also introduced Jim Springfield, the surveyor, who testified in substance that having information that a marker of the U.S. Government represented the northeast corner of lot 237 and the northwest corner of lot 232, he and the processioners commenced at this part and surveying southward passed directly over a square post hole in the ground which they presumed had marked the southeast corner of lot 237 and the southwest corner of lot 232; that continuing they found nothing to indicate a corner near where the southeast corner of lot 238 and the southwest corner of 231 should be, continuing on until they found a corner marked by a pile of rock which they found to be the southeast corner of lot 239 and southwest corner of lot 230, 1/2 mile south of the south end of the line they had set out to run; they retraced this last 1/2 mile northward and set up a corner to represent the south end of the line they were running; that all along this line they found trees with marks indicating that they were on an original land line. He testified that they had instructions to run the original line and that regardless of what they came to, that is the line they ran. He testified that they did not inquire of either of the parties hereto as to their contentions; that they heard no evidence concerning the same; that they made no inquiry as to possession on the part of either; and that in running along the edges of orchards and clearings they made no investigation as to who had cultivated or was cultivating these lands.
The applicant then introduced the three processioners whose testimony was substantially the same as that of Springfield, the surveyor. Also the applicant himself testified to the effect that he bought his property in 1944 or 1945; that earlier in 1939 or 1940 he bought the timber; that the first time he was ever on *Page 22 
this property with Mrs. Beavers was in 1945; that that was because she came to him and stating that she had sold her timber, suggested they ought to walk out the line; that he procured a compass and going to the rock cliff which she claimed was the corner they proceeded north; that later he walked from the rock cliff south, and being familiar with the property down there, knew this line was much too far east to be right; that thereafter he informed protestant that this line was not right and he would not accept it; she wanted him to go by a wire fence as a line for the south end, which was crooked, running from tree to tree through the woods, and by the line they had run as to the north end; the wire fence line was about 150 yards east of the original line as run by the processioners and the rock cliff line was about 300 yards east of this line; he testified that he refused to go by the rock cliff, and there was no agreement entered into respecting the line; she stated later that she was going to cut beyond the wire fence on the south end. The applicant testified that later he and the protestant ran another line in an effort to agree but no agreement could be reached; that thereafter he went with the processioners and surveyor in the running of the line as contended by him and observed the marks testified to by them as evidence of the original line that they were running.
After the evidence was closed and the jury retired, counsel for the protestant, made the following motion, "Your Honor, we move for a directed verdict in favor of the protestant against the return of these processioners, hereby moving to set the return of the processioners aside because the evidence is uncontradicted that they went up there to run an old original line, and did run an old original line and utterly disregarded as to the claims of either party, heard no evidence, gave no consideration to any contestant in this case, which is the duty of the processioners, and therefore what they might have done is not within their jurisdiction or authority. We make a motion at this time, your Honor, to direct a verdict in addition against the return of the processioners, but also in favor of the true line as set up by the protestant, because the evidence is undisputed as to where the true line is, and the work that should be done by the processioners has been done by this court; there is no reason for them duplicating what they have done." Thereupon *Page 23 
the court entered judgment as follows: "After hearing evidence and argument of counsel in this case the return of the processioners is dismissed and $ ____ as costs against M. E. Rogers. This 14th day of August, 1947. Stafford Brooke, J.S.C.C.C."
On this judgment error is assigned by the applicant in the main bill of exceptions because the court dismissed the return of the processioners and assessed the costs against him, and by the protestant on the cross-bill of exceptions because the court declined to direct a verdict in favor of the line as contended by her.
1. According to the testimony of the surveyor who was put up by the protestant and the three processioners who were introduced on behalf of the applicant, their sole purpose was to run the original line between land lot numbers 232 and 231, owned by the applicant, and 237 and 238 owned by the protestant. At some time or other in the testimony of each they so testified, and at no time was there any testimony to the contrary. On the other hand, there was evidence on behalf of the protestant that would have authorized the jury to have found that the general reputation in the neighborhood as to ancient landmarks of more than 30-years' standing, established this line at a point 300 yards more favorable to the protestant; that more than 30 years previously coterminous owners had run and established this line at the point as contended by protestant, and that this agreement had thereafter been duly executed by recognition on the part of the respective owners at this point as the line by cutting timber up to it; that there had been acquiescence to the point contended by protestant as the line by coterminous owners for more than 7 years; that there was actual adverse possession of a part of the land claimed by protestant in her and her predecessors in title for more than 20 years. Indeed, according to the testimony of the surveyor and the processioners themselves, there was evidence that the line as run by them went through land in the possession of the protestant. As was pointed out by Judge Gardner, speaking for this court, in Hall v.Browning, 71 Ga. *Page 24 App. 694 (32 S.E.2d 126), the duty of processioners appointed under authority of the Code, § 85-1605, is to survey and mark anew established lines as they actually exist, and not as they ought to have been laid out originally. Amos v.Parker, 88 Ga. 754 (16 S.E. 200); Wheeler v. Thomas,139 Ga. 598 (77 S.E. 817); Pearre v. Wilkinson, 181 Ga. 619
(183 S.E. 626); Cosby v. Reid, 21 Ga. App. 604
(94 S.E. 824); Aderhold v. Lambert, 67 Ga. App. 166 (19 S.E.2d 538). In processioning and marking anew established lines, the processioners are bound by the rules which the law prescribes. These general principles are set out as follows: "Natural landmarks, being less liable to change, and not capable of counterfeit, shall be the most conclusive evidence; ancient or genuine landmarks such as corner station or marked trees, shall control the course and distances called for by the survey. If the corners are established, and the lines not marked, a straight line, as required by the plat, shall be run, but an established marked line, though crooked, shall not be overruled; courses and distances shall be resorted to in the absence of higher evidence." Code, § 85-1601. "General reputation in the neighborhood shall be evidence as to ancient landmarks of more than 30 years' standing; and acquiescence for seven years, by acts or declarations of adjoining landowners, shall establish a dividing line." § 85-1602. "Where actual possession has been had, under a claim of right, for more than seven years, such claim shall be respected, and the lines so marked as not to interfere with such possession." § 85-1603. See Hall v. Browning
(supra). Therefore it appears that the processioners, who were no doubt honestly trying to do right between these parties, nevertheless disregarded the principles of law set forth in the Code sections quoted above.
However, it will be noted that while the motion of counsel for protestant was to direct a verdict, not only against the return of processioners, but also in favor of the line as contended by protestant, yet the judgment of the court was one dismissing the proceedings only. Though the evidence on the trial of a processioning proceeding, under Chapter 85-16 of the Code, is not sufficient to authorize the establishment of the line between coterminous owners of adjacent land lots as located by the processioners, yet it is error to dismiss the entire proceeding on the *Page 25 
ground that it is the province of the processioners to survey and mark anew established lines as they actually exist, and because they are without authority to run a new line, where the evidence as a whole authorizes the jury to establish such dividing line other than as located by the processioners. See Smith v.Clemons, 71 Ga. App. 592 (8) (31 S.E.2d 621). While the evidence in the instant case could not have authorized a verdict in favor of the applicant, yet, a verdict in favor of the protestant was authorized. The evidence being sufficient to have authorized a verdict determining the rights of the parties in the premises, the dismissal of the proceedings was error, and the case must be reversed. See, in this connection, Stewart v.Jackson, 144 Ga. 501 (2), (3) (87 S.E. 656).
2. By cross-bill of exceptions the protestant assigns error on the failure of the court, on motion of her counsel, to direct a verdict in favor of the line as contended by her, which motion was made at the same time her counsel moved for a directed verdict against the line as surveyed by the processioners. It is not necessary for this court to determine whether or not the evidence demanded a verdict in favor of the protestant. It is enough for us to point out that refusal to direct a verdict is not error in any case. Roper Wholesale Grocery Co. v. Faver,Kelly v. Strouse, Western Atlantic Railroad v. Michael,Coastal News Co. v. Jacksonville Paper Co. (supra).
Judgment reversed on the main bill of exceptions; affirmed onthe cross-bill. MacIntyre, P. J. and Gardner, J., concur.